United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 13, 1998 Decided July 31, 1998 

 No. 97-1274

 Air Canada, et al., 

 Petitioners

 v.

 Department of Transportation and 

 Rodney E. Slater, Secretary of Transportation, 

 Respondents

 Dade County, Florida and 

 American Airlines, Inc., 

 Intervenors

 Consolidated with
 No. 97-1284

 On Petitions for Review of an Order 
 of the Department of Transportation

 Stephen M. Shapiro argued the cause for petitioners, with 
whom Kenneth S. Geller, Roy T. Englert, Jr., Timothy S. 

Bishop, Joel Stephen Burton, Stephen P. Sawyer, Mary 
McGuire Voog and Lawrence M. Nagin were on the briefs.

 Thomas L. Ray, Senior Trial Attorney, U.S. Department of 
Transportation, argued the cause for respondents, with whom 
Joel I. Klein, Assistant Attorney General, U.S. Department of 
Justice, Robert B. Nicholson and Marion L. Jetton, Attor-
neys, Nancy E. McFadden, General Counsel, U.S. Depart-
ment of Transportation, and Paul M. Geier, Assistant Gener-
al Counsel, were on the brief.

 Alvin B. Davis, William K. Hill, James H. Burnley, IV, 
and John R. Keys, Jr. were on the brief for intervenor 
American Airlines, Inc. Karen L. Grubber entered an ap-
pearance.

 Thomas R. Devine, Charles A. Spitulnik, Michael M. 
Conway, Ross E. Kimbarovsky and Thomas P. Abbott and 
Gail P. Fels, Assistant County Attorneys, Dade County, 
Florida, were on the brief for intervenor Dade County Flori-
da.

 Scott P. Lewis and Kenneth W. Salinger were on the brief 
for amicus curiae Airports Council International--North 
America. Patricia A. Hahn entered an appearance.

 Before: Henderson, Rogers and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Six airlines ("Carriers") petition for 
review of two Department of Transportation ("Department" 
or "DOT") orders 1 investigating and approving the fees 
charged by Dade County, Florida, at Miami International 
Airport ("MIA").2 The essential dispute focuses on the rea-

__________
 1 Miami Int'l Airport Rates Proceeding, No. OST-96-1965, 
DOT Order 96-12-23 (Dec. 19, 1996) [hereinafter "Instituting Or-
der"], and DOT Order 97-3-26 (Mar. 19, 1997) [hereinafter "Final 
Order"].

 2 The Carriers are Air Canada, Delta Airlines, Inc., Lufthansa 
German Airlines, Trans World Airlines, Inc., United Air Lines, Inc., 

sonableness of fees that the County increased to cover the 
cost of MIA renovations and allocated according to an estab-
lished equalization methodology. The Carriers contend that 
the Department failed to apply the correct standard of rea-
sonableness, relied on findings unsupported by substantial 
evidence, made arbitrary and capricious decisions, erroneous-
ly placed the burden of proving unreasonableness on the 
Carriers, and denied the Carriers due process by assigning 
this burden in mid-proceeding without affording the Carriers 
an opportunity to present additional evidence. Because the 
Department applied valid and ascertainable legal standards 
and based its decision on substantial evidence and valid 
reasoning, and because the agency proceeding essentially
continued the Carrier's lawsuit in which they had the 
burden of proof and the Carriers can point to no prejudice 
resulting from the assignment or its timing, we deny the 
petitions.

 I.

 Section 511 of the Airport and Airway Improvement Act of 
1982 requires airports that receive federal grants for develop-
ment projects to charge "reasonable" fees. See 49 U.S.C. 
s 47107 (1994); Air Transp. Ass'n of America v. DOT, 119 
F.3d 38, 39 (D.C. Cir.), amended by 129 F.3d 625 (D.C. Cir. 
1997). In addition, the Anti-Head Tax Act authorizes public-
ly owned airports to collect only "reasonable" fees from 
airlines. See 49 U.S.C. s 40116(e)(2) (1994); Air Transp. 
Ass'n, 119 F.3d at 39. Traditionally, an airline could request 
an investigation by the Federal Aviation Administration 
("FAA") into potential violations of these reasonableness re-
quirements, but the FAA faced no deadline for initiating an 
investigation or making a final determination and taking 
appropriate enforcement action. See 14 C.F.R. ss 13.1, 13.3, 

__________
and US Airways, Inc. Three entities other than the Department 
have filed briefs in support of the orders: as intervenors, Dade 
County and American Airlines, Inc., and as amicus curiae, the 
Airports Council International-North America, a trade association 
representing the government bodies that own and operate the 
principal United States airports served by scheduled carriers.

13.5 (1998); see, e.g., New England Legal Found. v. Massa-
chusetts Port Auth., 883 F.2d 157, 159-60 (1st Cir. 1989). 
Before 1994, the Department was not required to issue 
standards for determining the reasonableness of fees and did 
not do so. See Air Transp. Ass'n, 119 F.3d at 39-40; see also 
Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 
355, 366-67 & n.11 (1994).

 To provide an expedited process and guidelines for resolv-
ing reasonableness disputes, Congress enacted Section 113 of 
the Federal Aviation Administration Authorization Act of 
1994, directing the Secretary of Transportation ("Secre-
tary") 3 to determine whether an airport fee is reasonable 
upon an airport's request or an airline's complaint. See 49 
U.S.C. s 47129(a), (c) (1994). Consequently, airlines now 
have two administrative options for challenging the reason-
ableness of airport fees--traditional investigation by the FAA 
or expedited determination by the Secretary--while airports 
have only the latter option. Section 113 also directs the 
Secretary to publish "final regulations, policy statements, or 
guidelines" establishing both procedures for acting on a re-
quest or complaint and standards for determining reasonable-
ness, id. s 47129(b), but the section neither amends the 
Airport and Airway Improvement Act of 1982 or the Anti-
Head Tax Act nor defines "reasonable."

 In June 1996, in compliance with Section 113, the Secretary 
published the Policy Regarding Airport Rates and Charges 
("Policy Statement"), 61 Fed. Reg. 31994 (1996). As relevant 
here, paragraph 2.6 of the Policy Statement permits an 
airport to "use any reasonable methodology to determine 
[non-airfield] fees, so long as the methodology is justified and 
applied on a consistent basis." Id. at 32020-21 p 2.6. Para-
graphs 2.1 and 3.1 require an airport to apply its rate-setting 
methodology consistently to, respectively, "similarly situated" 

__________
 3 The Secretary has delegated his authority under 49 U.S.C. 
s 47129 to the Assistant Secretary for Aviation and International 
Affairs. See 49 C.F.R. s 1.56a(i) (1997). For the purposes of this 
opinion, we refer to the ultimate agency decisionmaker under 49 
U.S.C. s 47129 as the "Department" or the "Secretary."


and "comparable" aeronautical users.4 Id. at 32019 p 2.1, 
32021 p 3.1. Subsequently, this court vacated certain portions 
of the Policy Statement, including paragraph 2.6, because the 
Department had not justified its decision to treat non-airfield 
fees (such as terminal fees) differently from airfield fees. See 
Air Transp. Ass'n, 119 F.3d at 41-45, amended by 129 F.3d 
at 625. While reserving judgment on whether paragraph 2.6 
satisfies the Section 113 requirement that the Secretary 
publish reasonableness standards, see id. at 41, the court 
suggested that it does not:

 The Secretary's "guideline" seems to be missing a "line." 
 The regulation merely states that any reasonable meth-
 odology will serve as a basis for non-airfield fees. That 
 concept does not seem to add much--if anything--to the 
 statutory requirement that airport fees be reasonable.

Id. at 41. The court added:

 [The Policy Statement] provides no real guidance as to 
 how the Secretary will determine reasonableness.... 
 [H]is regulation surely is inadequate under the [Adminis-
 trative Procedure Act].

Id. at 43.

 Against the statutory and regulatory backdrop before this 
court vacated portions of the Policy Statement, Dade County 
sought to increase MIA fees in order to finance a ten-year, 
$4.6 billion Capital Improvement Program ("CIP"). See Decl. 
of Guillermo Carreras 1. The improvements planned in the 
CIP include adding another runway and dual taxiways, dou-
bling the size of the terminal building, increasing the number 
of gates, adding moving sidewalks, improving Concourses E, 
F, G, and H, building a new Concourse J, and reconfiguring 
Concourses A through D from a layout that resembles four 
spokes on a wheel to a design featuring one long, linear A/D 

__________
 4 "Airports collect the bulk of their revenues from two general 
groups of users: aeronautical users, such as commercial (passenger) 
airlines, and non-aeronautical concessionaires, including car rental 
agencies, parking lots, restaurants, gift shops, and other small 
vendors." Air Transp. Ass'n, 119 F.3d at 39 n.1.

Concourse for the use of American Airlines, Inc. ("Ameri-
can"). See Decl. of Gary J. Dellapa 6-11. American operates 
a hub at MIA and, together with its commuter affiliate, 
carries 51% of the airport's passengers; the next largest 
carrier is United Air Lines, Inc. ("United"), which handles 
but 6.24% of MIA's passengers. See Decl. of John Van Wezel 
4. The A/D Concourse is designed to handle efficiently 
American's large passenger load. Furthermore, based on an 
agreement with Dade County, American will have exclusive 
use of the A/D gates so long as it averages 250 jet flights per 
day.5

 The County plans to include nearly all CIP costs in the 
terminal fees paid by all airlines, and to allocate the costs 
according to an equalization methodology developed by a 
committee that included American, Delta Airlines, Inc. ("Del-
ta") and US Airways, Inc. ("USAir"). Under this methodolo-
gy, used by MIA since 1990, fees for terminal space used 
exclusively by a single airline, such as ticket counters, are 
based on square footage without regard to age or condition of 
the particular space, while fees for facilities and services 
shared by airlines, such as baggage claim and concourse 
areas, are based on the number of aircraft seats carried by 
each airline. See John F. Brown Company, Inc., Dade County, 
FL, Overview of Airline Rates and Charges 7 (1994). Fees 
allotted by square footage account for approximately 20% of 
all terminal fees, while those allotted by number of seats 
account for 80%. See Test. of Daniel M. Kaspar, Tr. 1306. 
Allocated this way, the costs of CIP improvements to the 
terminal building will be pooled and divided proportionally 
among all airlines at MIA, such that each airline will inevita-
bly pay for improvements to some facilities and services that 
it does not use. See Decl. of Van Wezel 14-15. Dade County 
will except from the pooled costs, however, the costs of 
certain facilities used by only one airline; for instance, Ameri-
can will pay for an enhanced baggage sorting system dedicat-
ed to its exclusive use. Because most fees are proportional to 
passenger traffic, and American carries more than half of 

__________
 5 American will only have a month-to-month lease on terminal 
facilities such as ticket counters.

MIA's passengers, American currently pays 40.7% of MIA 
airline fees and would pay 46.5% under Dade County's pro-
posed new fee schedule under the CIP. See Decl. of Kaspar 
5.

 In September 1995, the Carriers, minus Lufthansa German 
Airlines, asked the United States District Court for the 
Southern District of Florida for a declaratory judgment that 
Dade County's proposed fees are unreasonable in violation of 
the Anti-Head Tax Act, because the cost of the A/D Con-
course 6 will be borne by all airlines even though only Ameri-
can will use the facility unless it reduces or ends its service. 
See Air Canada, Inc. v. Dade County, No. 95-2037-CIV-
LENARD, slip. op. at 2 (D.Fla. Nov. 7, 1996) (order on 
motions for summary judgment). The district court ruled 
that "determination of the reasonableness of the fees charged 
carriers by airport proprietors is properly made by the FAA," 
id. at 12, granted Dade County's motion to refer the determi-
nation of reasonableness to the FAA, id. at 21-22, and 
directed the parties to "take appropriate action pursuant to 
49 U.S.C. s 47129," id. at 22, even though that statute 
pertains to determinations by the Secretary rather than by 
the FAA.7 Accordingly, Dade County filed a request for 

__________
 6 Dade County and the Carriers dispute the cost of the A/D 
Concourse. The County asserts that renovation of the whole 
terminal building will cost $2.8 billion, with $975 million designated 
for the A/D Concourse and $1.8 billion for improvements to other 
concourses. See Decl. of Van Wezel 5. The Carriers maintain that 
the costs attributable to the A/D Concourse will reach almost $1.7 
billion. In addition to this disputed amount that will be divided 
among all airlines under the equalization methodology, American 
plans to spend $60 million on its own for an enhanced baggage 
sorting system and $90 million for communications equipment, 
furniture, fixtures, and finishes for its VIP lounge and other facili-
ties. See Decl. of Frank R. Erickson 18.

 7 Section 47129 provides in pertinent part:

 The Secretary of Transportation shall issue a determination as 
 to whether a fee imposed upon one or more air carriers ... is 
 reasonable....

49 U.S.C. s 47129(a)(1).

determination of reasonableness by the Secretary under 49 
U.S.C. s 47129, while the Carriers filed a complaint with the 
FAA under 14 C.F.R. s 13.5. See Miami Int'l Airport Rates 
Proceeding, No. OST-96-1965, DOT Order 96-12-23, at 10-11 
(Dec. 19, 1996) [hereinafter "Instituting Order"].

 In the first order under review ("Instituting Order"), the 
Department decided that the reasonableness of MIA's fees 
should be determined by the Secretary under 49 U.S.C. 
s 47129 rather than by the FAA under 14 C.F.R. s 13.5.8 
See Instituting Order at 17-18. The Department assigned 
the dispute to an administrative law judge for a hearing and, 
consistent with 14 C.F.R. ss 302.605(a), 302.607(b) (1998), 
which require the requesting and answering parties to set 
forth all arguments and evidence in their initial submissions 
to the Secretary, directed the administrative law judge to 
confine the hearing to the specific issues and evidence already 
submitted, allowing additional evidence to be submitted "only 
for good cause shown." Id. at 23. In addition, the Depart-
ment limited the scope of the proceedings in certain ways, 
including by directing the administrative law judge

 not [to] determine whether the equalization method is 
 inherently reasonable since the airlines do not challenge 
 it, nor ... whether the A/D Concourse is desirable or 
 necessary.... The question in this proceeding instead 
 is whether the airport's allocation of the costs of that 
 project is reasonable.

Id. at 24-25. The Department also directed the administra-
tive law judge to "follow the Policy Statement in determining 
whether the fees are reasonable" because no party challenged 
its applicability to the dispute. Id. at 25.

 Concluding that American should pay a larger share of the 
costs of the A/D Concourse, the administrative law judge 
found the fees related to the CIP and A/D Concourse to be 
unreasonable. The administrative law judge also determined 
that Dade County had the burden of proving reasonableness, 
although finding that "even if the burden of proof were on the 

__________
 8 The Carriers do not challenge this decision.

... Carriers, ... the preponderance of reliable and probative 
evidence establishes that the application of the [equalization] 
methodology to [the A/D Concourse] is unfair and unreason-
able." Miami Int'l Airport Rates & Charges, No. OST-96-
1965, Recommended Decision of A.L.J. 22 (served Feb. 17, 
1997) ("ALJ Decision").

 Both sides sought review, and in the second order under 
review ("Final Order"), the Department rejected many of the 
administrative law judge's key findings. See Miami Int'l 
Airport Rates Proceeding, No. OST-96-1965, DOT Order 97-
3-26 (Mar. 19, 1997) [hereinafter "Final Order"]. All parties 
agreed that the Department should apply the reasonableness 
standards embodied in the Policy Statement,9 specifically 
paragraphs 2.1, 2.6, and 3.1, and the Department concluded 
that the fees affected by the CIP and A/D Concourse would 
be reasonable under those standards.10 See Final Order at 1. 
Although noting that "the practices of other airports are not 
necessarily decisive for reasonableness determinations," the 
Department found that two other airports, O'Hare Interna-
tional and Pittsburgh International, had similarly undertaken 
projects required by a hub airline that increased the costs of 
other airlines. Id. at 34. Citing the lack of any evidence to 
the contrary, see id. at 22-23, the Department also found, 
contrary to the Carriers' argument, that "there is a substan-
tial likelihood" that CIP projects other than the A/D Con-
course will be completed, id. at 12, and that "the A/D Con-
course will be comparable to the facilities being built for other 
airlines." Id. The Department also concluded that errors in 

__________
 9 Although aware that other parties had petitioned for review of 
the Policy Statement, the Department concluded that "[t]he issues 
... raised by those parties do not involve the issues raised" by the 
Carriers. Final Order at 4 n.3. This court did not issue its 
decision vacating certain portions of the Policy Statement until 
more than four months after the Department issued this order.

 10 The Department placed two conditions on this determination: 
American's obligation to pay the cost of its enhanced baggage 
system must be unlimited; and, consistent with its equalization 
methodology, Dade County must charge American the cost of 
terminal facilities it exclusively uses. See Final Order at 37.

Dade County's initial fee calculations were irrelevant to 
whether the fees were allocated reasonably, see id. at 35-36, 
and rejected the administrative law judge's assignment of the 
burden of proving reasonableness, concluding that the Carri-
ers should bear the burden because five of them had initiated 
these legal proceedings by filing suit in district court. In so 
assigning the burden of proof, the Department observed that 
"[a]n important factor in our decision on the burden of proof 
is that our ruling will cause no unfairness for the Carriers 
given their opportunity to conduct discovery in the district 
court proceeding." Id. at 17.

 II.

 The Carriers begin by contending that the Department 
applied standards that this court recently invalidated as 
arbitrary and capricious and that do not meaningfully limit 
fees. But, acknowledging that this contention may not carry 
the day, they contend that if some of those standards survive, 
the Department lacked substantial evidence to support its 
findings that the A/D Concourse is comparable to new facili-
ties planned for other airlines, that Dade County applied its 
equalization methodology consistently, and that financing of 
other airports, namely, O'Hare International and Pittsburgh 
International, is similar to MIA's. Further, the Carriers 
contend that the Department acted in an arbitrary and 
capricious fashion in four respects: it relied on the prospect 
of future construction as proof that all airlines would eventu-
ally have comparable facilities but ignored evidence that at 
least one concourse can never be made comparable to the A/D 
Concourse; it took issue with the policy decisions of the 
administrative law judge yet claimed that its Final Order did 
not set general policy; it requested findings on MIA's fee 
calculations but later deemed them irrelevant; and it ignored 
evidence that MIA's fee allocation would harm competition 
among airlines. Finally, the Carriers maintain that the De-
partment's decision to place the burden of proof on them was 
erroneous because the County filed the request for a reason-
ableness determination and possessed the cost data and other 
information most relevant to the reasonableness of its fees, 


and further, that due process requires a new hearing because 
the Carriers had proceeded on the understanding that they 
did not bear the burden of proof. Notably, the Carriers 
make no attack on the equalization methodology itself, only 
on its application. For the reasons that follow we conclude 
that the Carriers' contentions fail. 

 A.

 The Carriers contend that the Department failed to apply a 
legally correct reasonableness standard or, indeed, any dis-
cernable reasonableness standard at all. They make three 
arguments: first, the Department based its orders on an 
invalid rule; second, the Policy Statement's reasonableness 
standards provide no restraints on terminal fees; and third, 
these standards do not comport with the Supreme Court's 
instructions in Northwest Airlines, 510 U.S. at 355.

 The Carriers maintain first that a remand is necessary 
because, in the orders under review, the Department applied 
the legal standards embodied in the Policy Statement, part of 
which the court vacated and viewed as providing "no real 
guidance as to how the Secretary will determine reasonable-
ness." Air Transp. Ass'n, 119 F.3d at 43. Even if an agency 
adjudication invokes a subsequently vacated rule, however, 
the adjudication does not automatically become invalid. If a 
petitioner cannot show any way in which its interests were 
impaired by the agency's adherence to the rule, the court 
need not remand in light of that rule's vacation. See Inde-
pendent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 
920-22 (D.C. Cir. 1982). Only one of the three Policy State-
ment paragraphs upon which the Department relied was 
vacated, see Air Transp. Ass'n, 129 F.3d at 625, and the 
Carriers have no substantial argument that this invalidated 
paragraph so affected the Department's actions as to require 
a remand. The two surviving paragraphs require airports to 
apply their fee-setting methodologies consistently to compara-
ble airlines, see Policy Statement, 61 Fed. Reg. at 32019 p 2.1, 
32021 p 3.1, while the vacated paragraph included these same 
consistency and comparability requirements plus the require-
ment that the airport's methodology be reasonable and justi-

fied, see id. at 32020-21 p 2.6. This extra requirement is not 
relevant in this case, however, for the Carriers conceded in 
their submissions to the Department and this court that the 
equalization method is generally a fair way to calculate non-
airfield fees; that is, the Carriers do not contest the method-
ology's reasonableness or justification, only the way it was 
applied. See Joint Carriers Answer & Brief 5 n.6, 9-10, 16. 
Consequently, the Department's orders did not depend upon 
an invalid rule, but rather rested on the comparability and 
consistency standards embodied in two valid paragraphs of 
the Policy Statement along with the equalization methodology 
that the Carriers accepted. Because the vacated paragraph 
did not affect the Department's decision, any basis for the 
Carriers' contention that the orders were issued under an 
invalid rule evaporates. See Independent U.S. Tanker Own-
ers Comm., 690 F.2d at 921-22.

 Second, the Carriers maintain that the Policy Statement 
provides no restraint on fees because its standards in general 
are not based on public utility ratemaking law and economics, 
and because its comparability and consistency standards are 
meaningless. The Carriers, however, failed to raise these 
objections in their submissions to the Department.11 See 
Joint Carriers Response to Judge's Order 14; Joint Carriers 
Answer and Brief 16. Yet "[n]o objection to ... a final order 
shall be considered by the court unless objection was urged 
before an administrative law judge or the Secretary ... 
unless there were reasonable grounds for failure to do so." 
49 U.S.C. s 47129(c)(6). The Carriers contend that they 
were not required to satisfy this exhaustion provision because 
the Department received notice of these objections in the 
earlier proceedings challenging the Policy Statement, see Air 

__________
 11 The Carriers did argue to the Department and this court 
that the A/D Concourse and American's right to use it are not 
comparable to the facilities used by and rights of other airlines. 
See Joint Carriers Answer & Brief 57-58. Because this argument 
is not an objection to the validity of the legal standards but instead 
to their application, we address those arguments in our discussion 
of whether the Department's orders were based on reasoned deci-
sionmaking. See infra section II.B.


Transp. Ass'n, 119 F.3d at 41, and it would have been futile to 
reargue the same issues.12 Whether or not these precise 
objections were raised in the Air Transp. Ass'n proceedings, 
the Department plainly stated in the Instituting Order that it 
did not consider the issues raised in those proceedings to be 
relevant to the MIA fee dispute. See Instituting Order at 4 
n.2. The Carriers never objected to this position, instead 
implying that they agreed with it by accepting the Policy 
Statement's standards as governing the dispute. See Joint 
Carriers' Response to Judge's Order 3; Joint Carriers' Brief 
to Dep't Decisionmaker 14-15, 42-43. Under these circum-
stances, the Carriers were obliged, in order to avoid "sand-
bagging" the Department, to alert the Department to their 
objections to the Policy Statement's degree of restraint on 
fees and the purported meaninglessness of the "comparabili-
ty" and "consistency" standards. Cf. USAir, Inc. v. DOT, 969 
F.2d 1256, 1260 (D.C. Cir. 1992). The Carriers offer no 
reasons why the Department would not have considered these 
objections had they been raised. Consequently, we decline to 
consider them. See 49 U.S.C. s 47129(c)(6).

 Third, the Carriers maintain that the Department's reason-
ableness standards must be at least as stringent as those 
applied by the Supreme Court in Northwest Airlines and 
must therefore both prohibit excessive cross-subsidies and 
require cost-benefit analysis. In Northwest Airlines, the 
Court examined whether fees at Kent County International 
Airport in Grand Rapids, Michigan, were reasonable under 
the Anti-Head Tax Act and the Commerce Clause. See 
Northwest Airlines, 510 U.S. at 358. Observing that the 

__________
 12 Like many statutes that contain similar exhaustion provi-
sions, Section 113 of the Federal Aviation Administration Authoriza-
tion Act of 1994 codifies the judicial doctrine of exhaustion of 
administrative remedies. See 49 U.S.C. s 47129(c)(6); Washington 
Ass'n for Television & Children v. FCC, 712 F.2d 677, 681-82 (D.C. 
Cir. 1983). This doctrine permits courts to waive exhaustion re-
quirements in certain circumstances, including when the agency has 
considered an argument after another party raised it and when 
raising the argument before the agency would have been futile. See 
id. at 682 & nn.9-10.

Secretary is better equipped than the courts to determine 
reasonableness under the Anti-Head Tax Act but had provid-
ed no guidance on the subject, the Court applied dormant 
Commerce Clause jurisprudence 13 to the Anti-Head Tax Act 
claims and held the fees to be reasonable. See id. at 366-69, 
374. The Court stated, however, that should the Secretary 
determine that "some other formula (including one that en-
tails more rigorous scrutiny)" is preferable, "his exposition 
will merit judicial approbation so long as it represents 'a 
permissible construction of the statute.' " Id. at 368 n.14 
(quoting Chevron U.S.A. Inc. v. Natural Resources Defense 
Council, Inc., 467 U.S. 837, 843 (1984)); see also id. at 366-67. 
Thus the Court made clear that it was not establishing a 
standard for reasonableness under the Anti-Head Tax Act, 
and that the Secretary could establish another standard, 
whether more or less stringent than the standard the Court 
adopted in Northwest Airlines, so long as it was a permissible 
construction of the statute. We need not delve into whether 
Northwest Airlines requires a cost-benefit analysis or any 
other particular study,14 nor whether the Department's rea-

__________
 13 Under the dormant Commerce Clause, a fee is reasonable "if 
it (1) is based on some fair approximation of use of the facilities, (2) 
is not excessive in relation to the benefits conferred, and (3) does 
not discriminate against interstate commerce." Northwest Air-
lines, 510 U.S. at 369 (citing Evansville-Vanderburgh Airport Auth. 
Dist. v. Delta Airlines, Inc., 405 U.S. 707, 716-17 (1972)).

 14 In any event, the Carriers cannot accept the equalization 
methodology as generally reasonable and yet at the same time 
insist on a prohibition on cross-subsidies and a cost-benefit analysis 
of the CIP because these concepts are meaningless under an 
equalization methodology. The Carriers have not shown how these 
two positions are consistent. Because facilities are renovated at 
different times, some airlines will always be subsidizing improve-
ments to facilities used by other airlines. Likewise, a cost-benefit 
analysis for a renovation project will naturally show that the airline 
whose facility is being improved by that project receives benefits 
that exceed costs. While it would be unreasonable for one airline 
exclusively and consistently to receive much greater benefits than 
others without bearing greater costs as well, the Carriers have not 


sonableness standards are consistent with those applied by 
the Supreme Court in Northwest Airlines, because the De-
partment was not bound to the standards in that case.

 B.

 Turning to the Carriers' challenges to the Department's 
findings, we conclude that none of the challenges is persua-
sive. The Carriers contest the findings that: the A/D Con-
course and American's right to use it are comparable to the 
facilities and rights of use of other airlines; MIA applied its 
equalization methodology consistently; and O'Hare Interna-
tional and Pittsburgh International airports have built newer 
or better facilities for hub airlines and charged all airlines the 
costs of these facilities. The court must defer to the Depart-
ment's decision if it was reasoned, see City of Los Angeles 
Dep't of Airports v. DOT, 103 F.3d 1027, 1031 (D.C. Cir. 
1997), and must affirm the Department's decision unless it 
was arbitrary, capricious, an abuse of discretion, or otherwise 
not in accordance with law, see 5 U.S.C. s 706(2)(A) (1994). 
The Department's findings of fact are conclusive if supported 
by substantial evidence.15 See 49 U.S.C. s 47129(c)(6).

__________
demonstrated that such an imbalance exists at MIA. See infra 
section II.B. Whether or not the Policy Statement provides so 
little guidance as to allow such an imbalance under a different set of 
facts is a question left for another day, because the Policy State-
ment is presently on remand to the Secretary. See Air Transp. 
Ass'n, 119 F.3d at 45, amended by 129 F.3d at 625.

 15 The Carriers suggest that the court should review the De-
partment's findings under a less deferential standard because the 
Department overturned findings made by the administrative law 
judge. The Supreme Court instructs, however, that the substantial 
evidence standard is not modified in any way when an agency and 
an administrative law judge disagree; instead, where credibility of 
witnesses is at stake, an administrative law judge's evaluation of the 
witness' testimony may be an indicator of the substantiality of the 
evidence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 
496-97 (1951); see also Chen v. GAO, 821 F.2d 732, 734 (D.C. Cir. 
1987); National Ass'n of Recycling Indus., Inc. v. Federal Mari-
time Comm'n, 658 F.2d 816, 824-25 (D.C. Cir. 1980). Ultimately, 

 First, in challenging the Department's determination that 
the A/D Concourse is comparable to other facilities, the 
Carriers point to evidence that the A/D Concourse will be 
bigger and more expensive than the other concourses, will 
include special features such as a people-mover (a train-like 
vehicle), moving walkways, larger gates, and access to dual 
taxiways, will be subsidized by airlines other than American, 
is dedicated for American's exclusive use under a unique 
agreement, and includes features that other concourses will 
never have under the CIP. Further, the Carriers note that 
there is no agreement guaranteeing the construction of new 
facilities other than the A/D Concourse. The Carriers supply 
no evidence contradicting that relied on by the Department, 
but instead contend that due to these differences, many of 
which Dade County acknowledges, the A/D Concourse cannot 
logically be comparable to other concourses.

 While there is evidence to support many of the Carriers' 
observations, the Department's finding of comparability is 
nevertheless based on substantial evidence and reasoned 
analysis. The Department relied on testimony from a CIP 
architect, see Test. of Guillermo Carreras, Tr. 571-74; Second 
Decl. of Carreras 3-5, and an airport planning engineer, see 
Decl. of Richard Haury 12-13, to conclude that the "A/D 
Concourse will be essentially comparable with the other new 
concourses in terms of size, scope, finish, and furnishings." 
Final Order at 24. The Department further relied on the 
CIP architect's testimony, see Test. of Carreras, Tr. 550-55, 
and that of the representative of USAir, see Test. of Charles 
Stipancic, Tr. 1577-78, in finding that the "gates contained in 
all of the new or renovated concourses will be of the same size 
as much as possible." Final Order at 24. The Department 
also reasonably concluded that MIA's decision to provide 
larger gates on the A/D Concourse than are needed to 
accommodate American's current fleet of aircraft was based 
on MIA's desire to increase its number of international gates 

__________
where there is substantial evidence supporting its results, the 
Department's view governs. See Greater Boston Television Corp. 
v. FCC, 444 F.2d 841, 853 (D.C. Cir. 1970).


overall and to build gates that could accommodate larger 
aircraft in the future. See id. at 24-25.

 The Department found that, except for the baggage sorting 
system for which American agreed to pay, the features of the 
A/D Concourse were not "so special or unusual that they 
should be charged entirely to American." Id. at 27. Specifi-
cally, the Department observed that the A/D Concourse will 
not be the only one with a people-mover, since Concourse E 
already has one and will receive a better one as part of the 
CIP, and accepted an airport planning engineer's testimony 
that this train-like vehicle would be necessary on any con-
course as lengthy as the A/D. See id. at 28; Second Decl. of 
Haury 2-3. The Department also found, based on the same 
engineer's testimony, see Second Decl. of Haury 5, that the 
demolition costs associated with the A/D Concourse are typi-
cal of airport renovation projects and are normally borne by 
all airlines. See Final Order at 29. Based on the CIP 
architect's testimony, the Department found that some 
concourses other than A/D would have access to dual taxi-
ways. See id. at 29-30; Test. of Carreras, Tr. 483-86. In 
addition, the Department found that American's right to use 
the A/D Concourse so long as it maintains an average of 250 
daily jet flights should not affect the comparability analysis 
because at issue is cost allocation, and the rights conferred on 
American do not entail any costs. Furthermore, American 
committed to maintain a certain level of service in exchange 
for these rights, unlike other airlines that made no similar 
commitments. See Final Order at 31-32.

 The Department reasoned that comparability of facilities 
must be assessed over time because the equalization method-
ology relies on assumptions that different facilities are reno-
vated at different times and that at any point some airlines 
will be using older facilities than others, but that over time, 
every airline will obtain new facilities. See id. at 25-26. In 
other words, once the equalization methodology is adopted, 
inequalities at any moment in time are inevitable, but eventu-
ally every carrier benefits albeit not necessarily to the same 
exact extent. The Department also concluded that it was 
unlikely that Dade County would not complete the CIP 


projects for airlines other than American because: several of 
those projects are underway and scheduled to be completed 
before the A/D Concourse; MIA must be expanded to meet 
traffic needs; and the Carriers presented no evidence to 
indicate that Dade County will not complete projects other 
than the A/D Concourse. See id. at 22-23.

 The difference between the positions of the Carriers and 
the Department arises largely from their differing percep-
tions of the meaning of comparability. The Carriers main-
tain, in essence, that comparable facilities should have similar 
costs and be of similar overall size. They also maintain that 
facilities cannot be comparable if an old facility, like Con-
course G, is substantially inferior to a new one, or if a facility 
for one airline is being subsidized by other airlines.16 These 
views, however, clash with the equalization methodology, un-
der which comparability is measured over time, and each 
airline subsidizes the construction of new facilities for other 
airlines but then benefits when new facilities are constructed 
for its main use. Further, facilities for an airline that carries 
more than half of an airport's passengers must necessarily be 
more expensive and larger on an absolute basis than those for 
airlines that carry less than seven percent each of the air-
port's passengers; evidence of larger size and scope on an 

__________
 16 Although decrying cross-subsidies in general, the Carriers 
produced no evidence of cross-subsidization. Their sole expert 
witness on this topic estimated that airlines other than American 
would pay twelve to forty-eight million dollars more in annual fees if 
the A/D Concourse were constructed than if it were not. See Decl. 
of Daniel P. Kaplan 6-7. Even if true, this assertion does not 
establish the existence of a "subsidy" because it does not compare 
American's contributions to the costs of renovating other airlines' 
facilities with other airlines' contributions to the costs of the A/D 
Concourse, and it does not take into account the increase in 
American's fees--and consequent decrease in other airlines' fees--
that will result from an increase in American's passenger traffic. 
Further, the Carriers have not demonstrated that American did not 
subsidize their operations in the past, when its facilities were less 
modern than those for other airlines such as USAir. See Final 
Order at 19-20.

absolute basis does not imply disproportionality when passen-
ger traffic and overall fees are taken into account. The 
Carriers offer no evidence that compares the benefits of the 
CIP to each airline on a per-fee-dollar basis,17 a per-
passenger basis, or any other basis that takes into account 
the vast differences between the scale of American's opera-
tions at MIA and those of other airlines.

 In contrast, the Department observed that because 80% of 
terminal fees are based on passenger traffic, American cur-
rently pays 40.7% of MIA airline fees and would pay 46.5% 
after the CIP is completed. The Department also noted that 
American will pay approximately half of the total costs of the 
CIP, see Final Order at 31; because the A/D Concourse 
makes up slightly more than a third of the CIP's total costs 
according to the County's estimate, see supra note 6, Ameri-
can will bear significant costs for renovations to facilities that 
it does not use. The Department also emphasized that if, as 
expected, the increased efficiencies of the A/D Concourse 
enable American to increase its passenger traffic at MIA, 
then its terminal fees will increase, and the Carriers' fees will 
decrease. See Final Order at 20.

 Although the Carriers' view of the meaning of comparabili-
ty may be reasonable, there is nothing unreasonable about 
the Department's alternative view. Given the deference that 
the court must accord an agency's interpretation of its own 
regulations, see Udall v. Tallman, 380 U.S. 1, 16 (1965), it 
follows that the Department's view of the meaning of "com-
parability" prevails, and given the deference to an agency 
adjudication inherent in substantial-evidence review, see Al-
lentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 
828 (1998), it follows that the Department's finding of compar-
ability is valid.

 Second, the Carriers challenge the Department's finding 
that MIA applied the equalization methodology consistently, 
on the ground that MIA plans to charge American for some 

__________
 17 The Carriers submitted no such analysis, and indeed, their 
expert witness complained about the failure of the County's expert 
to do so. See Decl. of Kaplan 9.

specialized facilities it exclusively uses, such as American's 
enhanced baggage sorting system, but not for other unique 
features of the A/D Concourse, such as those on the "better-
ments list," which a consultant developed at MIA's request to 
itemize arguably unusual features of the A/D Concourse 
considered to be potential charges to American. The Depart-
ment determined that the question of whether MIA applied 
the equalization methodology consistently was premature. 
See Final Order at 32-33. Because the A/D Concourse had 
not yet been designed, it was not yet possible to determine 
which features ought to be charged to American. The De-
partment addressed this analytic difficulty by conditioning its 
finding of reasonableness on Dade County's applying its 
methodology consistently. The Department also rejected any 
use of the "betterments list" as evidence that certain items 
ought to be charged to American, because the MIA staffer 
who requested the list stated that it was merely a negotiating 
tool and because "neither the County government nor the 
airport's executive officials ever approved the list as a state-
ment of policy on the proper allocation of charges." Id. at 27. 
Because the question of whether MIA applied the equaliza-
tion methodology consistently cannot be answered until de-
signs for the A/D Concourse are completed and costs allocat-
ed, we conclude that there is nothing unreasonable about the 
Department's approach.

 Third, the Carriers challenge as unsupported by substantial 
evidence the Department's finding that O'Hare International 
and Pittsburgh International airports built facilities demand-
ed by hub airlines and imposed some of the costs on other 
airlines. The Department stated in its Final Order, however:

 the practices of other airports are not necessarily deci-
 sive for reasonableness determinations. Our decision 
 here is based on the specific facts of this case, particular-
 ly the airport's need to improve and expand all of its 
 facilities and its plans to build new facilities for most of 
 the airlines at MIA.

Final Order at 34-35. Because the Department's findings 
regarding other airports were not decisive, and because the 


Department's comparability findings--which were decisive--
were supported by substantial evidence, the court need not 
address this challenge further. See 5 U.S.C. s 706 ("[D]ue 
account shall be taken of the rule of prejudicial error."); Salt 
River Project Agric. Improvement & Power Dist. v. United 
States, 762 F.2d 1053, 1060 n.8 (D.C. Cir. 1985); Consolidated 
Gas Supply Corp. v. FERC, 606 F.2d 323, 328-29 (D.C. Cir. 
1979); 3 Charles H. Koch, Jr., Administrative Law and 
Practice s 10.7 (2d ed. 1997).

 C.

 The Carriers further challenge the Department's decision-
making as arbitrary and capricious, based on four instances of 
allegedly illogical or inconsistent reasoning. We disagree.

 First, the Carriers point to inconsistent reasoning in that 
the Department stated that it would be concerned if other 
airlines would pay for much of the cost of a hub airline's new 
facilities when they would not have comparable facilities, see 
Final Order at 13, acknowledged that Concourse G, used by 
Trans World Airlines, Inc. ("TWA") and Air Canada, would 
not be rebuilt under the CIP and is not currently similar to 
the A/D Concourse, see id. at 25, and yet, seemingly inconsis-
tently, approved the fees at issue as reasonable. As noted, 
under the equalization methodology, all airlines share in the 
costs of renovating all concourses. An underlying assumption 
of the methodology is that some airlines will have newer or 
better facilities while others have older or poorer ones, but 
that, over time, all airlines will receive newer and better 
facilities. For example, as USAir's representative testified, 
Concourse H, used by Delta and USAir, will be renovated 
first, at which time it will be superior to Concourses C, D, and 
G, but all airlines will share its costs. See Test. of Stipancic, 
Tr. 1583. Likewise, Concourse F, used by United, is current-
ly superior to Concourse G, and yet all airlines share in its 
costs. See Prehearing Conf. Tr. 352. As the Department 
observed:

 After all, other airlines already have better space than 
 TWA and Air Canada, yet no one has objected to the 

 airport's use of the equalization methodology to charge 
 TWA and Air Canada the same rate as the airlines with 
 the better space. Notably, neither Air Canada nor TWA 
 has challenged the airport's use of the methodology for 
 space which is not as good as the space used by other 
 airlines.

Final Order at 25. Although Concourse G will not be rebuilt 
under the CIP, it will be improved, and a CIP architect 
testified that it may later be demolished, with TWA and Air 
Canada moving into Concourse H or some other space newer 
and better than Concourse G. See Test. of Carreras, Tr. 518-
20. Thus, the Department's reasoning regarding Concourse 
G is consistent with the equalization methodology, which the 
Carriers acknowledge is generally fair.

 Second, the Carriers maintain that it was inconsistent for 
the Department to disagree with the policy views of the 
administrative law judge regarding when facilities are compa-
rable, see Final Order at 12 n.7, yet elsewhere indicate that 
its orders were not intended to set general policy on the 
allocation of costs associated with the construction of new 
facilities for a hub airline, see id. at 34-35. In stating that it 
disagreed with the policy views of the administrative law 
judge, the Department was merely acknowledging that it 
accepts the premise of the equalization methodology that fees 
are reasonable if airlines receive new and comparable facili-
ties over time, even when at any given point in time, some 
airlines have newer and better facilities than others, while the 
administrative law judge essentially rejected this view, see 
ALJ Decision at 65-70. In other words, the administrative 
law judge erred, for example, in finding that MIA's fees 
cannot be reasonable so long as the A/D Concourse will be 
better than Concourse G. See Final Order at 25. In dis-
claiming that it was setting broad policy, the Department was 
simply stating that reasonableness determinations would be 
made based on the specific facts of each case, and that it was 
not endorsing any general fee practice. We are unpersuaded 
that its statements are inconsistent.


 Third, the Carriers maintain that the Department capri-
ciously shifted position, first directing the administrative law 
judge to make findings on the validity of the fee calculation, 
see Instituting Order at 23, but then ruling this issue irrele-
vant when Dade County acknowledged errors in its calcula-
tions, see Final Order at 35-36. The Department explained, 
however, that the administrative law judge had misconstrued 
its Instituting Order, which also directed consideration only of 
issues raised in the parties' pleadings. See Final Order at 35. 
Although the Carriers did refer to flaws in the cost data, see 
Joint Carriers' Answer & Brief 25-26, 32 n.30, 37, they did so 
in the context of making general arguments that Dade Coun-
ty was improperly requesting an advisory opinion on future 
rates and that the financing of the A/D Concourse was unlike 
development projects at other airports or previous projects at 
MIA. They did not make a general claim that the fees were 
unreasonable because they were miscalculated. As a result, 
the Department concluded that only the allocation of the fees, 
not their calculation, was at issue, and the calculation errors 
were irrelevant. See Final Order at 36. Additionally, the 
Department concluded, and the Carriers do not dispute, that 
the calculation errors meant only that too large a share of the 
A/D Concourse costs was attributed to landing fees and too 
little a share to terminal fees. See id. The Carriers have 
offered no argument why the court should reject the Depart-
ment's interpretation of their initial submissions or its conclu-
sions as to the lack of prejudice from the error in calculations. 
See 5 U.S.C. s 706. Thus, there is no basis to find the 
Department's treatment of the fee calculation errors to be 
arbitrary and capricious.

 Fourth, the Carriers maintain that the Department ignored 
evidence and arguments on the impact of the fee allocation on 
competition among airlines. Construction of the A/D Con-
course will increase American's efficiency, resulting in shorter 
time periods between connecting flights, which will make 
American more desirable to airline customers. The Carriers 
contend that fees cannot be reasonable where they force 
airlines to pay for renovations to enhance the efficiency of 
their competitors. Yet this argument is simply another way 


to state the Carriers' position that fees cannot be reasonable 
when one airline subsidizes renovations to benefit another. 
Because renovations, improvements, and reconfigurations of 
facilities will likely increase the efficiency of the airlines using 
them, as the new people-mover planned for Concourse E will 
increase the efficiency of airlines using that concourse, any 
fee allocation based on the equalization methodology will 
necessarily force airlines to subsidize projects that increase 
their competitors' efficiency.

 D.

 Finally, the Carriers contend that the Department erred in 
placing the burden of proving reasonableness on them and 
denied them due process by assigning this burden to them in 
mid-proceeding without allowing them to submit new argu-
ments or evidence. The administrative law judge placed the 
burden of proof on Dade County, as the requestor of the 
reasonableness determination, because the proponent of a 
rule or order generally has the burden of proof under the 
Administrative Procedure Act ("APA"), see 5 U.S.C. s 556(d) 
(1994); Director, Office of Workers' Compensation Programs, 
Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 272 
(1994), and the administrative law judge saw no good reason 
for assigning this burden differently. The administrative law 
judge also thought placing the burden on the Carriers would 
be unfair to them because the requesting party, here Dade 
County, has sixty days following the notice of imposition of 
fees to file a request and may frame arguments and submit 
evidence in both a requesting brief and a reply brief, while 
the answering party, here the Carriers, has but fourteen days 
from the filing of the requestor's initial filing to file its only 
submission. See 14 C.F.R. ss 302.603(b), 302.607(c), 
302.609(a) (1998).

 The Department rejected the administrative law judge's 
analysis, concluding that the Carriers should bear the burden 
of proof because they initiated the legal dispute by filing suit 
in district court and, thus, Dade County is in the position of 
"requestor" only because the district court directed the par-


ties to seek review under 49 U.S.C. s 47129.18 See Final 
Order at 16-17. The Department explained, however:

 An important factor in our decision on the burden of 
 proof is that our ruling will cause no unfairness for the 
 ... Carriers. They began the litigation over the air-
 port's fees, they were able to conduct discovery in the 
 district court proceeding, and they have known since the 
 district court issued its order in November 1996 that the 
 fee issue would be litigated in an administrative forum. 
 The ... Carriers accordingly have had ample opportuni-
 ty to prepare their case in response to the airport's 
 request for a determination. This is not a case where 
 the airlines had neither notice that there would be litiga-
 tion over the reasonableness of an airport's fees nor an 
 opportunity to investigate the airport's documentation for 
 the fees in dispute.

Id. at 17.

__________
 18 The Department observed in the Final Order that:

 [T]his case is unusual because of the circumstances giving rise 
 to the filing of Dade County's request. In our view, if an 
 airport imposes a new or increased fee and then files a request 
 with us for a determination under 49 U.S.C. 47129 that the fee 
 is reasonable, the airport would generally bear the burden of 
 proof in support of its request.... When an airport seeks an 
 affirmative determination by us as to a fee's reasonableness 
 and validity, and no airline complaint is simultaneously filed, we 
 see no unfairness in placing the burden of proof on the airport. 
 Moreover, we would expect the airport to be prepared in such a 
 case to demonstrate the fee's reasonableness....

Final Order at 17.



 Without implying that a mid-course change in the assign-
ment of the burden of proof can produce anything other than 
problems, and is hardly a preferred method of procedure, the 
circumstances leading to the filing of Dade County's request are unusual,
effectively placing the Carriers in the position of the requestor in the 
instant case, and therefore the bearer of the burden of proof. Because 
the district court directed the parties to take appropriate action under
 s 47129 to submit the claim to the FAA, the agency proceeding was 
essentialy a continuation of the Carriers' lawsuit.19 

 But even if the Department erred in making a mid-course
change in assignment of the burden of proof, the Carriers show no 
prejudice as a result. As incorporated into the APA, the harmless error 
rule requires the party asserting error to demonstrate preju-
dice from the error. See 5 U.S.C. s 706 ("[D]ue account shall 
be taken of the rule of prejudicial error.") (emphasis added); 
Doolin Sec. Savings Bank, F.S.B. v. OTS, 139 F.3d 203, 212 
(D.C. Cir. 1998) (citing U.S. Dep't of Justice, Attorney 
General's Manual on the Administrative Procedure Act 110 
(1947), reprinted in Administrative Conference of the Unit-

___________
 19 Metropolitan Stevedore Co. v. Rambo, 117 S. Ct. 1953 (1997), is not
to the contrary, inasmuch as there was no initial determination here that Dade County
sought to modify and the Carriers filed suit in the district court where they 
clearly bore the burden of proof.
ed States, Federal Administrative Procedure Sourcebook 67, 
176 (2d ed. 1992)); cf. Burkhart v. Washington Metro. Area 
Transit Auth., 112 F.3d 1207, 1214 (D.C. Cir. 1997). While 
the Carriers contend that they were prejudiced when the 
Department placed the burden of proof on them because they 
tailored their case to their initial understanding of the bur-
den, they fail to explain how they were harmed. When 
questioned twice during oral argument about what specifically 
the Carriers would have done differently had they known at 
the outset of the agency proceedings that they bore the 
burden of proof, the Carriers' attorney answered twice that 
they would have cross-examined the Dade County witness 
who acknowledged errors in the fee calculations and that they 
would have presented evidence about how other airports 
calculate their fees. Because neither of these issues was 
essential to the Department's determination of reasonable-
ness, the Carriers fail to show they were prejudiced because 
they could not explore them further.

 Likewise unpersuasive is the Carriers' contention that they 
were prejudiced because, as the answering party, they were 
permitted to file only one submission while the County filed 
two, and had only fourteen days to file their submission while 
the County had sixty days. They point to no evidence or 
arguments they would have made with the additional submis-
sion and time. The Department's regulations required the 
Carriers to put forth all arguments and evidence in their 
answer to Dade County's request. See 14 C.F.R. 
s 302.607(b). Hence, their arguments and evidence presum-
ably would have been virtually the same regardless of wheth-
er they knew that they bore the burden of proof. Indeed, the 
administrative law judge expressly noted in his opinion that 
which party had the burden of proof was irrelevant to the 
ultimate determination. Additionally, as the Department not-
ed, the Carriers had ample time for discovery in the district 
court proceedings and knew from the time of the district 
court's order that they would have to present their evidence 
against the reasonableness of the fees in an administrative 
proceeding. See Final Order at 17.


 Further, although the Carriers assert that the burden of 
proof assignment was outcome-determinative, they do not 
explain why or how. This assertion rests on a single footnote 
in which the Department states that its disagreement with 
the administrative law judge's comparability determination 
"largely results from our different policy views, our conclu-
sions on the burden of proof, and our analysis of the airport's 
fee structure and [CIP]." Final Order at 12 n.7. But this 
sentence alone cannot suffice to demonstrate prejudice to the 
Carriers because it does not indicate that the Department 
would have found the fees to be unreasonable had it reached 
a different conclusion on the burden of proof, nor does it 
indicate that the Department concluded that the Carriers 
failed to put forth a prima facie case of the unreasonableness 
of MIA's fees. See Final Order at 17.

 Finally, the burden of proof could hardly be outcome-
determinative in the instant case because the Department's 
conclusions did not turn on evidence or the lack thereof. The 
Department relied on the parties' acceptance of both the 
Policy Statement and the general fairness of the equalization 
methodology in determining what legal standard to employ. 
The Department found that the A/D Concourse was compara-
ble to other concourses by applying that methodology to 
largely undisputed evidence. The Department concluded that 
it would be premature to make any determination of whether 
MIA applied its fee methodology consistently, but conditioned 
its Final Order on consistent application. While the Depart-
ment's conclusion regarding the financing of different airports 
was based on disputed facts, it was unimportant to the 
Department's ultimate decision.

 Undoubtedly, there generally should be clarity at the out-
set of an administrative proceeding regarding where the 
burden of proof will lie, and some assurance that it will 
remain there while the matter is before the agency. The 
unusual circumstances giving rise to the filing of Dade Coun-
ty's request may explain what happened here. In any event, 
given the Department's evidentiary and procedural regula-
tions requiring parties to put forth all of their evidence at the 
outset, see 14 C.F.R. ss 302.605(a), 302.607(b), and the De-


partment's notice directing the parties to so proceed, see 
Instituting Order at 23, after the Carriers had obtained 
considerable discovery during the pendency of the district 
court proceeding, the Carriers now would have to demon-
strate actual prejudice. The Carriers have made no such 
showing.

 Accordingly, because the Department applied a valid and 
ascertainable legal standard, and the Carriers failed to dem-
onstrate that the Department's decision was arbitrary, capri-
cious or unsupported by substantial evidence or that they 
were prejudiced by the Department's decision to place the 
burden of proof on them, we deny their petitions.